Filed 9/1/21  In re K.T. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.T. et al., Persons Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY, | F082323 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 20JP-00085A, 20JP-00085C) |
| v. | |
| K.B., | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Forrest W. Hansen, County Counsel, and Jennifer Trimble, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

# **INTRODUCTION**

K.B. (mother) has five children: K.T. (born August 2011), twins K.P.T. and B.T. (born April 2017), I.B. (born March 2019), and N.B. (born April 2020).[1] Mother lost her parental rights to the twins in August 2019 in North Carolina due to substance abuse and domestic violence issues. K.T., I.B., and N.B. were subsequently removed from mother's care in July 2020 in Merced County. As it relates here, the juvenile court denied her reunification services as to all three children under Welfare and Institutions Code section 361.5, subdivision (b)(11)[2] on the basis that mother failed to correct the problems that led to the twins' removal.

Mother appeals the juvenile court's order bypassing her for reunification services under section to 361.5, subdivision (b)(11), as to her children, K.T. and N.B.[3] We dismiss the appeal as to K.T., but address mother's appeal as it relates to N.B.[4] Mother contends (1) substantial evidence did not support the bypass of reunification services under section 361.5, subdivision (b)(11), and (2) the juvenile court abused its discretion when it failed to order reunification services under to section 361.5, subdivision (c). We disagree and affirm the juvenile court's order.

---

[1] K.T., the twins, I.B., and N.B. have different fathers.

[2] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

[3] Mother's appeal of the juvenile court's order denying her reunification services as to I.B. is a separate case before this court (*K.B. v. Superior Court of Merced County* (May 11, 2021, F082325) [nonpub. opn.]).

[4] On July 13, 2021, the agency filed a motion to dismiss the appeal as moot on the basis that dependency of K.T. was dismissed on May 10, 2021, and as to N.B. on June 29, 2021. As only the termination of dependency as to K.T. is final at this time, we dismiss the appeal as to that child only. We take judicial notice of the minute orders of the Merced County Superior Court case No. 20JP-00085-A, dated May 10, 2021, and in case No. 20JP-00085-C, dated June 29, 2021.

*Removal*

On July 10, 2020, mother and Fortune Johnson[5] were seen arguing in a van in the parking lot of a Merced County Human Services Agency (agency) office. One-year-old I.B. and two-month-old N.B. were also in the van. A social worker met with the family to assess the children's safety.

Johnson reported that all four of them lived in the van. Johnson was not the children's father, but wanted to help them in light of mother's substance abuse and domestic violence problems. He stated mother had been smoking crack cocaine in the van all night in the children's presence and " 'became a terror and started screaming that [he] stole her dope.' " In response to his attempts to calm her, she cracked his windshield with a hammer, broke his cell phone, and "took [the] hammer to the front passenger seat." Johnson said mother would smoke crack cocaine in the van with the windows rolled up with the children inside. Johnson also reported that three days earlier, he and mother were arguing over his not wanting to take care of the children. As a result, mother tossed N.B. from the middle of the van to the front of the van where Johnson was sitting. Fortunately, he caught N.B. and the child suffered no injury. Additionally, according to Johnson, they had a 14-day hotel voucher, but were kicked out of the hotel because of mother's erratic behavior when her drug supply ran out. Lastly, Johnson reported there was a history of domestic violence with mother, showing the social worker a scar on his forehead that he received after mother struck him on the head with a cup.

The social worker then contacted mother lying in the van holding two-month-old N.B. in her arms. Mother appeared lethargic, slow to respond, and seemed to be under the influence of a substance. Mother claimed she had not slept the night before and was

---

[5] Though mother and Johnson possessed a marriage license, it had never been registered, so the validity of the marriage is questioned.

unable to hold a conversation with the social worker.  At one point, mother began feeding N.B. spoiled milk from an unwashed bottle.  Both children had severe diaper rashes.  In addition to her lethargy, N.B. would not open her eyes, and her stomach was swollen.

The van was extremely dirty and cluttered.  There were cigarette butts, ash, and tobacco all over the carpet and seats.  Although there were car seats for the children, there was no place to secure them.  There were four jars of marijuana in an unlocked box and other tools within the children's reach.  No food or formula could be found in the van except for half a gallon of warm, spoiled milk as mother stated she was feeding N.B. whole milk because she was getting her used to it.  Mother purchased food as needed because she had nowhere to store it.  The van smelled of sulfur, dirt, marijuana and cigarette smoke, rotting food and diapers.  Despite the July heat, the van was not equipped with any working air conditioner or fan.

Mother was arrested for assault on a child resulting in great bodily harm or death.  According to the arresting deputy, she appeared to be high on an illegal substance.  Mother admitted smoking crack cocaine with the children inside the van.  Both Johnson and mother reported a history of domestic violence in their relationship.  I.B. and N.B. were medically cleared and placed in protective custody.  K.T., then eight years old, was living with his paternal grandmother at the time of this incident.  The agency left K.T. under his grandmother's care.

### Section 300 Petition

On July 14, 2020, the agency filed a dependency petition, alleging mother and the children's fathers had failed to provide adequate food, clothing, and shelter for the children and that mother's substance abuse and domestic violence placed the children at risk of suffering serious physical harm or illness.  (§ 300, subds. (b) and (g).)  The petition further alleged that mother abused or neglected the children's half siblings, the

4.

twins, placing the children currently in her custody at a substantial risk of similar abuse and neglect.  (§ 300, subd. (j).)

### Detention Hearing

On July 15, 2020, the juvenile court held the detention hearing.  Mother appeared while in custody.  She denied all allegations, but submitted as to detention.  The court found the children within the provisions of section 300, subdivisions (b), (g), and (j), and set a combined jurisdictional/dispositional hearing for August 5, 2020.  This hearing was continued several times until January 26, 2021.

### Jurisdiction/Disposition Reports and Hearing

The jurisdictional report recommended the juvenile court take jurisdiction over K.T., I.B., and N.B. under section 300, subdivisions (b), (g), and (j).  The report detailed mother's dependency history in California and North Carolina as follows:

In August 2011, K.T. tested positive for marijuana at birth.

In August 2012, social services received an allegation of neglect for K.T.  The referral stated mother smoked crack cocaine while K.T. was in her care and that she left for extended periods of time to use crack cocaine without making proper arrangements for his care.  K.T. was removed from mother's care and placed with his biological father.  Mother enrolled in parenting classes and entered an in-patient rehabilitation program.

In April 2017, mother's twins tested positive for crack cocaine at birth.  Additionally, there was a substantiated allegation of domestic violence between mother and the twins' father.  Mother agreed to participate in services.

In June 2017, social services received an allegation of neglect regarding the twins.  In addition, there were domestic violence and substance abuse concerns.  Mother failed to engage in services, which led to the termination of her parental rights in August 2019.

In April 2020, mother tested positive for marijuana and crack cocaine at N.B.'s birth.  Mother admitted using marijuana four times a week and crack cocaine two days

prior to giving birth. A voluntary family maintenance case was opened, and she agreed to enroll in a drug treatment program and submit to drug testing, which she complied with.

K.T. was interviewed for the purpose of the jurisdiction report. He reported that his mother had always smoked cigarettes and marijuana. However, she started " 'drinking daily and smoking cocaine' " when she met Johnson. He knew about his mother's cocaine use because his grandmother told him, but he personally observed his mother smoke marijuana and drink alcohol. He said his mother drank two or three beers daily and would become "mean" and argue with Johnson. Mother and Johnson would argue " 'all the time.' "

Mother was interviewed over the telephone while in custody. The social worker reviewed the petition with her. Although mother admitted using crack cocaine in the past, she denied ever doing so in the presence of the children. Mother claimed confusion as to why she was arrested, charged, or in custody. She disagreed with the charges and asserted she was " 'not guilty.' " Mother reported she had used cocaine, marijuana, and alcohol in the past but did not believe her children had been affected by her drug use, except for the twins whom she had already lost custody. She claimed sobriety from 2012-2017, while incarcerated, but started using again upon her release.

On November 3, 2020, the agency filed its disposition report recommending mother be bypassed for reunification services pursuant to section 361.5, subdivision (b)(11), and recommended striking the section 300, subdivision (g) allegation as mother was no longer incarcerated. Mother reported that she would benefit from any services the agency could offer because she did not " 'want to fall into old habits.' " When asked what services he thought his mother would benefit from, K.T. stated, " 'Get rid of [Johnson], buy a house. If she [took] a class, she would stop drinking 24/7.' "

Attached to the disposition report was a copy of the North Carolina order terminating mother's parental rights to her twins. The order stated, "[t]he conditions which led to the juveniles coming into custody include but are not limited to the domestic violence between the parents in the presence of the juvenile; the parents' violation of their safety plan; the parents' consumption of alcohol in presence of the juveniles; and the parents' substance abuse issues." The order further noted that although mother was offered services, she failed to correct the conditions that led to the twins' removal. Mother consistently tested positive for alcohol, marijuana, and crack cocaine from April to July 2018.

At the jurisdictional/dispositional hearing on January 12, 2021, the agency modified its previous recommendation to provide K.T.'s and N.B.'s fathers family maintenance services and instead recommended that both children be returned to their respective fathers' care. Mother's counsel requested a continuance in light of the agency's new recommendation and the court continued the hearing to January 14, 2021.

On January 13, 2021, the agency filed an addendum report. The report contained the additional information that on November 4, 2020, mother left the residential program Hope for Women, after she informed the house manager that she had broken the house rules by using drugs and alcohol. A few weeks later, mother called the Child Welfare Emergency hotline to report that K.T. (who had been previously removed from her custody) was in her care and was in bad health. Deputy Ross of the Merced County Sheriff's Department met with mother and conducted a welfare check. Deputy Ross reported that when she asked mother where K.T. was, mother pointed to her backpack and began talking to it. Mother told the backpack to tell Deputy Ross what "the lady" did. She asked the backpack not to be shy. She told Deputy Ross that K.T. could not walk because "the lady sat on his legs." One week later, mother submitted to a drug test.

Her urine drug test was negative for drugs, but she refused to submit to a hair follicle test because she did not want to cut her hair.

The juvenile court reset the contested jurisdictional/dispositional hearing for January 26, 2021, and allowed the agency to place K.T. and N.B. with their fathers.

*Contested Jurisdictional/Dispositional Hearing*

At the contested jurisdictional/dispositional hearing mother submitted as to jurisdiction, but contested the dispositional recommendation to bypass her for reunification services.

**Mother's Testimony**

Mother testified that she and K.T. moved to Laramie, Wyoming in October 2018, to live with her sister and treat her drug problem. She was pregnant with I.B. and dependency proceedings regarding her twins were ongoing in North Carolina. In August 2019, her parental rights were terminated as to her twins. Mother stated she was not using drugs at the time and remained sober while living in Laramie. She maintained her sobriety by going to church and attending parenting classes. She went to classes for five months, until she gave birth to I.B. in March 2019. She also attended Narcotics Anonymous meetings when she was able to, but did not go regularly due to the meetings being held 25 minutes away from Laramie. Mother left Laramie approximately at the end of July 2019, and moved to Stockton, California, to K.T.'s paternal grandmother's house. While living in Stockton, she became pregnant with N.B. and met Johnson.

In June 2020, mother moved to Merced with Johnson as K.T.'s grandmother was moving to North Carolina. Mother took I.B. and N.B. with her, but K.T. stayed with his grandmother. Initially, mother's relationship with Johnson was good, but then "things turned sour." Johnson would run off with her money and disappear for days at a time. Mother suspected he was using drugs. While in Merced, mother stayed at Johnson's niece's house, but Johnson was not allowed to stay there because "they had bad history."

Mother stated she and Johnson argued a lot and he would throw things, but he never struck her with anything. She denied breaking his windshield claiming it was Johnson who broke it.

Mother recounted the incidents leading up to the children's removal. She stated that the night before the removal, she was at Johnson's niece's house while Johnson stayed in the van in front of the house. She and Johnson began arguing because she thought he had stolen her money. She claimed she spent the night inside the house and the next morning she and the children got in the van with Johnson and went to the park. When they got there, she began arguing with Johnson again. They left the park when he became angry and went to a gas station to buy snacks for I.B. Mother asked the gas station clerk to call the police because Johnson would not take her back to his niece's house. The police responded and performed a wellness check on the children and told Johnson to take mother back to his niece's house. However, he drove to the agency instead where they continued arguing. Mother denied using crack cocaine the night before the children's removal. She said the last time she used crack cocaine was days before N.B.'s birth, but admitted she had been consuming alcohol and smoking marijuana. She denied smoking around the children or that there was physical violence between her and Johnson.

Mother testified she pled guilty to child endangerment in exchange for probation and was released on August 24, 2020. The day after her release, she was admitted to Hope for Women. Mother began taking parenting classes on September 1, 2020. She completed a 12-week ACE Overcomers parenting course and an eight-week Positive Discipline parenting course. Mother stated she signed up for the classes on her own initiative. She recognized that she had been a neglectful parent and said she learned useful parenting skills in class. She also enrolled in online classes to pursue a bachelor's degree in business. On January 14, 2020, she started another parenting class called

9.

Nurturing Parenting. She was also scheduled to start a parenting course called Caring for Children Who Have Experienced Trauma.

At the time of the contested hearing, mother was living in a transitional home through Valley Crisis Center. She was scheduled to start a " 'truck driver plus forklift certificate' " trade program and was enrolled in an alcohol or drug program. She completed her drug and alcohol assessment in December 2020 and signed up for the program in January 2021. Mother stated that none of the classes she enrolled in were based on referrals from the agency. She said she was drug tested weekly through her alcohol or drug classes and had tested negative every time.

Mother stated that if the court ordered reunification services, she would participate. She believed reunification services would be beneficial to her and the children. She said, "I'll get a chance to—to get this right this time. I didn't try with my twins. Well, I began trying, but I gave up. I was just a terrible person at the time. And I'm ready and willing and committed to changing for my children's sake."

On cross-examination, mother reiterated that the last time she used crack cocaine was a few days before N.B.'s birth in April 2020, and the last time she used marijuana and consumed alcohol was the day before the children's removal in July 2020. Prior to that, she had not used crack cocaine since approximately July 2017. She began using crack cocaine when she was 21 years old. Mother stated she enrolled in the "alcohol or drug program" because she was afraid of relapsing. She recognized that she used drugs to cope with her problems. Additionally, she said she enrolled in domestic violence classes after she read the agency's report, stating that she had not addressed any of her issues and because she wanted to know why she was getting into relationships that were based on domestic violence. She acknowledged all of her relationships had domestic violence, whether it was "punching, kicking, slapping, hitting[,] or arguing."

10.

Regarding the twins, mother testified they were removed because she constantly argued with their father and because they were born with crack cocaine in their system.

Deputy county counsel asked mother why she had consistently tested positive for alcohol and illegal substances in April, May, and June of 2018. According to mother, she said she was clean, but had used someone else's urine for testing. She claimed she needed to test positive in order to stay in the drug and counseling program she was in. Ultimately, she left the program because it "wasn't working for [her]." In July 2018, she was scheduled to begin an in-patient treatment program, but decided not to go once she realized she was pregnant with I.B.

Mother was required to complete 52 weeks of parenting classes as part of her probation terms. Initially, she denied that the parenting classes she was enrolled in were part of her probation terms, but ultimately agreed that they were. Counsel highlighted that mother pled guilty on August 24, 2020, and started parenting classes on September 1, 2020.

When asked whether she was aware that the agency received information by the Hope for Woman house manager that she broke the house rules by using drugs and alcohol she said, "Yes. And I had to say that in order to get out of the program and not feel—it was a lie." According to mother, she wanted to get out of the program because Hope for Women would not allow her to take her children there. She wanted to try to get into a program where she could have her children with her. In regards to the hair follicle test she refused in November 2020, she said she refused the test due to not knowing how it worked and did not want to cut her hair as it took her hair a long time to grow. Additionally, she said she called child protective services on November 16, 2020, when K.T. said he was afraid of his foster parents. She denied speaking to her backpack, claiming she was actually speaking to K.T. through her bluetooth earpiece.

**Social Worker's Testimony**

Social worker Veronica De La Cruz testified she was aware of K.T.'s complaint regarding the foster parents and the children were removed from the foster parent's home out of an abundance of caution. There was an ongoing investigation related to the incident.

**Argument**

Mother's counsel argued that mother had been making reasonable efforts to address the issues that caused the twins' removal. He noted that after she was released from jail, she immediately enrolled in classes and was able to articulate what she learned. He argued it was in the children's best interest to remain together. Minor's counsel concurred, arguing mother was taking responsibility and trying to improve her life. She agreed it would be in the children's best interest to provide mother reunification services. Fathers' counsels were also in agreement to provide mother with reunification services. County counsel argued that mother's efforts to treat her problems were not reasonable and she was minimizing her drug use. She recommended bypassing mother for reunification services.

**Juvenile Court's Findings**

The juvenile court found that mother's testimony was "littered with inconsistencies" and did not find her testimony credible. It stated as follows:

> "This case has, to say it mildly, a number of contradictions throughout, and the Court took note and picked up on a variety of those contradictions.

> "Mother contends that the only two times that she's used cocaine was a few days before the birth of the youngest child in this case, and the prior time before that was back in the North Carolina case, which I believe it was back in 2017.

> "Yet, the reports that I've taken judicial notice of indicate that not only did Mr. Johnson, but mother herself admitted to authorities that she

12.

used crack cocaine. So there's an issue with acknowledgement on that issue alone, but it doesn't stop there.

"There's a plethora of issues and cases that simply don't fit together. And the Court looks for consistency because that's how it judges the credibility of a witness. Credibility is important because it's trying to ascertain the intent of the party and its efforts, which are critical in this case.

"And as [mother's counsel] quite aptly noted, reasonable efforts is the key in this case. It centers around that. That is the central issue. [¶] … [¶]

"The Court notes that the testimony regarding other substance abuse issues in this case, including the twins, was problematic. [¶] … [¶]

"The fact that mother admits that she's used someone else's urine in the—for the sole purpose to defraud another court is very concerning as well. That's enormous by itself. But it doesn't stop there. And the list keeps going on.

"As the Court went through this, I looked at the detention report. (b)(5) deals with substance abuse, (b)(6) substance abuse, (b)( 7) domestic violence. That's the detention petition. The detention report itself on page three, where Mr. Johnson admitted that they were doing crack cocaine the night before, that mother had used the hammer against the vehicle and smashed the window. He didn't. He said she did.

"Deputy Ross there indicated mother admitted use, of doing crack cocaine and with the kids and in the van, and that was from 11:00 p.m. to 5:00 a.m. from July 9th to July 10th, 2020. Mother, in her testimony today, denies that it happened. Others got it wrong. Page five of that same report, where mother admits domestic violence involving Mr. Johnson on multiple occasions.

"And the reason I bring those up, for hopefully the apparent reason, is both substance abuse and domestic violence are the issues that led to the removal of the twins. [¶] So that's what the Court has to look at it, and look at the reasonableness of efforts to address those issues that were in the North Carolina case.

"It looks to the disposition report filed November 3rd, 2020. Page 15, where it reiterates Mr. Johnson's contention regarding the use of both of

13.

them using cocaine, mother's domestic violence, that mother, when on drugs, acts erratically. That was the word, erratically. And there was various instances that were discussed throughout these reports of erratic behavior by mother. [¶ ] … [¶ ]

"All of this taken together in the totality of this, the stream and the common denominator here is mother has a persistent problem that continues to be a problem. And then the question then begs itself, 'Well, are the efforts that she is proffering to the Court addressing this issue, are those reasonable even though she has those issues?' [¶] … [¶]

"Mother indicates that she did all of these activities addressing her problems because those were her desire because she was scared of relapsing, if I recall her testimony correctly, and she wanted to figure out how to resolve them.

"Yet, the class that she took, she enrolled in that after she pled. And that class fulfills a term and condition of her Felony Probation. It's one thing to say, 'I voluntarily did something and I'm doing this because I'm addressing the issue,' it's another because, 'well, oh, I also have to do this in a criminal case.' And that's present in this case. That class was enrolled in after the plea, and that plea required a 52-week program, recalling mother's testimony.

"So when the Court looks at the totality of this and the testimony of mother, first, it's having a difficult time and finds that mother's testimony is not credible. [¶] … [¶]

"The Court in this case finds that there is clear and convincing evidence that mother did not make reasonable efforts. I don't find them reasonable under the totality of the circumstances, and given her testimony that is littered with inconsistencies throughout it. And it's a shame."

Accordingly, the juvenile court sustained the section 300, subdivisions (b) and (j) allegations and dismissed the section 300, subdivision (g) allegation. The juvenile court bypassed mother for reunification services and, as to K.T. and N.B., ordered family maintenance services for their fathers and set a family maintenance review hearing for June 14, 2021.

On February 1, 2021, mother filed a notice of appeal.

14.

## DISCUSSION

### I.    Bypass of Reunification Services

Mother contends the juvenile court erred in bypassing her reunification services pursuant to section 361.5, subdivision (b)(11), on the basis that she had not made reasonable efforts to treat the problems that led to the removal of the children's half siblings, the twins. Specifically, she argues that there was no evidence establishing the reasons that led to the removal of the twins and that, even if there was, there was insufficient evidence to find that she had not made reasonable efforts to treat those problems. We disagree.

#### A.    Section 361.5, Subdivision (b)(11)

"As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to 'the child and the child's mother and statutorily presumed father.' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120 (*Jennifer S.*), citing § 361.5, subd. (a).) However, reunification services need not be provided when the court finds by clear and convincing evidence "[t]hat the parental rights of a parent over any sibling or half sibling of the child [have] been permanently severed … and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." (§ 361.5, subd. (b)(11).)

"In order to meet the burden to establish, by clear and convincing evidence, a lack of reasonable efforts in this regard, child welfare workers must focus on the facts underlying the previous dependency action and its resolution, as well as on any efforts made by the parent *since the sibling removal*." (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1126.) Moreover, "[t]he 'reasonable effort to treat' standard 'is not synonymous with "cure." ' " (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393 (*K.C.*).) "A

'parent who has worked toward correcting his or her problems [has] an opportunity to have that fact taken into consideration in subsequent proceedings.' " (*Ibid.*) "To be reasonable, the parent's efforts must be more than 'lackadaisical or half-hearted.' " (*Ibid.*) "Moreover, not every 'effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made.' " (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1121.)

"A court reviews an order denying reunification services under section 361.5, subdivision (b) for substantial evidence." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96 (*Cheryl P.*).) Substantial evidence exists when the evidence is "reasonable in nature, credible, and of solid value," so that "a reasonable mind would accept [it] as adequate to support [the] conclusion." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under this standard of review, we consider the record as a whole, in the light most favorable to the juvenile court's findings and conclusions. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734.) "[W]e do not make credibility determinations or reweigh the evidence." (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1122.)

### B.    Analysis

Mother contends there was no competent evidence establishing what the problems were that led to the removal of her twins. The record reflects mother's twins were removed due to substance abuse and domestic violence issues. The North Carolina order terminating mother's parental rights as to her twins was attached to the agency's

disposition report.  The order stated the twins were removed due to mother's substance abuse and domestic violence issues.  The juvenile court took judicial notice of both the disposition report and the findings contained in the North Carolina order under Evidence Code section 452, subdivision (d).  Under Evidence Code section 452, subdivision (d), a court may take judicial notice of "[r]ecords of … any court of record of the United States or of any state of the United States."  Moreover, "[a] social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)."  (§ 355, subd. (b).)  Additionally, mother provided statements to the investigating social workers and the arresting deputy confirming that her parental rights to her twins were terminated due to her substance abuse and domestic violence problems.  She also testified at the contested jurisdictional/dispositional hearing that the twins were removed because they were born with crack cocaine in their system and because she constantly argued with their father.  Accordingly, we find there was sufficient evidence establishing that mother's twins were removed due to her substance abuse and domestic violence problems.

Next, we consider whether there was sufficient evidence to support the bypass of reunification services for mother under section 361.5, subdivision (c)(11).  Mother correctly notes that "[t]he 'reasonable effort to treat' standard 'is not synonymous with "cure." ' "  (*K.C.*, *supra*, 182 Cal.App.4th at p. 1393.)  However, as previously noted, the juvenile court may consider the "*duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness."  (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1121.)  In the present case, mother's parental rights to her twins were terminated in August 2019 and N.B. was removed from mother's care in July 2020.  Thus, mother had 11 months to address the problems that led to the twins' removal.  (*Id.* at p. 1126 ["child welfare

17.

workers must focus on the facts underlying the previous dependency action and its resolution, as well as on any efforts made by the parent *since the sibling removal*"].)

At the time of N.B.'s removal, mother and Johnson reported a history of domestic violence in their relationship. Johnson reported that the night before the children's removal, mother broke his cell phone and the van's windshield with a hammer in I.B. and N.B.'s presence after she accused him of stealing her " 'dope.' " Mother admitted she smoked crack cocaine in the van in the children's presence. Days earlier, they were kicked out of a hotel because mother ran out of drugs and began acting erratically. Additionally, a few months prior to the removal, mother tested positive for crack cocaine and marijuana at N.B.'s birth. K.T. reported that ever since mother met Johnson she drank every day and became "mean" and argued with Johnson.

Mother did not begin making an effort to treat her substance abuse and domestic violence problems until after N.B. was removed. After she was released from jail, she was immediately admitted to Hope for Women, but it was short-lived. Less than three months later, mother relapsed and left the program. A few weeks later, she was acting erratically again, speaking to a backpack and contending it was K.T. She also refused to submit to a hair follicle test because she did not want to cut her hair, claiming it took her hair a long time to grow. Although, mother enrolled in parenting classes in September 2020, she admitted the classes were a part of her probation terms in her criminal case for child endangerment. Given mother's continued substance abuse and domestic violence after the removal of her twins, the juvenile court properly concluded that mother's efforts to treat the problems requiring the twins' removal were not reasonable.

## II. Section 361.5, Subdivision (c)(2)

Lastly, mother contends the juvenile court abused its discretion when it failed to order reunification services under section 361.5, subdivision (c)(2). We disagree.

Once the juvenile court determines that a parent falls under section 361.5, subdivision (b)(11), it shall not order reunification services for that parent "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) "The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55).) "[P]recedent supplies certain relevant considerations when making a best interests determination. For instance, '[t]o determine whether reunification is in the child's best interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity.' " (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1124.) "It is the parent's burden to prove that the minor would benefit from the provision of court-ordered services." (*Ibid.*) We review a juvenile court's best interest determination for abuse of discretion. (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229 (*William B.*).)

In this case, mother has been using crack cocaine since she was 21 years old. K.T. and the twins tested positive for drugs at birth, and mother also admitted to using drugs the week of N.B.'s birth. Mother has been offered services multiple times and has repeatedly failed to overcome her substance abuse and domestic violence issues. She has a history of using drugs in front of her children and has subjected her children to years of domestic violence. Mother argues that the quality of parent-child love and relationships shown during visitation support that reunification is in the children's best interests; however, "[t]he [children's] bonds with the mother cannot be the sole basis for a best interest finding." (*William B.*, *supra*, 163 Cal.App.4th at p. 1229.) Given mother's long history of substance abuse, her inability to stay away from relationships involving domestic violence, N.B.'s young age, and her need for stability, we fail to find the

juvenile court abused its discretion when it failed to order reunification services under section 361.5, subdivision (c)(2).

## **DISPOSITION**

The juvenile court's order is affirmed.

SMITH, J.

WE CONCUR:


HILL, P.J.


DETJEN, J.